Boeing, J.,
dissenting:
I think this case is within the rule of commercial law shown by the English and American authorities cited by the learned counsel for the petitioner.
And that rule is that, in a sale of specified goods on credit or for negotiable notes, bonds, &c., on time, the insolvency of the buyer before the notes, bonds, &c., are due or negotiated authorizes the seller, if in possession of the goods, to retain them as security for the price.
This rule transcends the rule of the common law, that gives an unpaid vendor a lien for the price, because it acts where both the right of property and the right of possession have vested in the buyer; and it differs from the right of stoppage ira trcms-iiu, because it acts only when the seller has retained the actual possession of the goods, while the right of stoppage in transitu .acts only when the seller has parted with the actual possession ■of the goods.
The rule is referred in the books to the civil law, as are many of the rules of our commercial law, and it arose from the system of sales on credit and for negotiable instruments, which created commerce. And the reason of the rule is, that a sale on credit implies between the parties that the buyer shall keep his credit good for the transaction in reference to which the credit is given; so that the unpaid vendor has a stronger equity .against the goods still in his hands than the creditors of the buyer in other transactions. ^
Of the cases cited in the argument on this point that most analogous to this is the case of Arnold v. Delano, (4 Cush., p. 33,) in which the opinion of the court was read by Chief Justice Shaw, whose professional practice and whose judicial eminence belonged especially to commercial law.
In that case the defendant, Delano, sold sixty-five cords of wood, which were on his laud, and part of a larger quantity, to Sowerby & Grant; the wood was piled, measured and staked off, to show the extent of the sixty cords, and a negotiable note, at six months, was given for the price, and a bill of sale of the wood was given by the seller, receipted thus : u Received payment by note at six months, at Northampton Bank.” And it was agreed that the buyers might remove the wood at their convenience at any time within a year.
*286 Afterward Sowerby & Grant, the buyers, dissolved partnership, and Sowerby assumed the debts and took, by transfer, the property of the firm ; and before the woo.d was removed or the note was due or negotiated he became insolvent. His assignee in insolvency brought the suit for the wood, and the seller claimed the right to retain it till payment or its equivalent.
Chief Justice Shaw thus states the legal result of the facts and the question raised by them :
“In the present case the wood was marked off and identified, and the vendees had a license for one year to come on the vendor’s land and to take it away. This was a complete sale, and a constructive delivery, to vest the property in Grant and Sow-erby ; and on their dissolution and transfer it vested in Sow-erby, and by the assignment in his assignee. Then the question is, whether the defendant had, under the circumstances, a lien for the price, and we think he had.”
And the chief justice proceeds to argue on the facts thus : “ The vendees did not enter and take the wood; it remained on the vendor’s land and in his possession in the same manner as before and at the time of the sale. The vendor acted in no new capacity; he was to receive nothing for the keeping; he was precisely in the condition of a vendor who has not parted with' the possession and custody of the goods sold. And this was the state of things when Sowerby went into insolvency, upon which event we think the vendor was remitted to his right to keep possession of the wood as a security for the price. Such a vendor in possession is regarded as having a higher equity to-retain for the price than the assignee of a debtor who has not paid for the property has to claim it for the general creditors.”
And the chief justice states the abstract rule of law thus : “ The law, in holding that a vendor who has thus given credit for goods waives his lien for the price, does so on one implied condition, which is, that the vendee shall keep his credit good. If, therefore, before payment, the vendee becomes bankrupt or insolvent, and the vendor still retains the custody of the goods or any part of them, * * * then his lien is restored, and he may hold the goods as security for his price.”
In the case cited and in this before us the material facts were the same; in both the sale was complete and the property vested in the buyer, and the negotiable paper given was *287 secured expressly as payment. In both the property sold was in the possession of the vendor, free of rent and subject to the disposition of the buyer, who could immediately, and before the paper given had become due, have taken it into his possession, and in both he became insolvent before the paper given in payment became due.
And on the rule of law affirmed iu the case cited, I think that the petitioner, on the insolvency of the Confederate government, had the right to hold the cotton against them as security for the price, and that he has the same right as against the United States, claiming as successors of the Confederate government.
And I think it immaterial that, in arranging the payment by the bonds with the Confederate government, a small sum was paid in cash to the petitioner. The bonds were on interest, and when the January coupons were detached did not make the precise price of the cotton, and the money was paid to make tip that price precisely, and this fractional payment could not of itself entitle the Confederate government, after its insolvency, to the delivery of the cotton sold to them.
And I think it immaterial that, after the cotton was seized, it was agreed between the agent of the Treasury Department and the petitioner that the latter should put the cotton in order for sale. Such arrangement grew out of the circumstances of the case.
The cotton had been seized, and the petitioner had notified the Department of his claim in July, 1865. In September, 1865, the cotton was not to be returned to him, but was to be sold under the statute, and its net proceeds paid into the Treasury, and the title to those adjudicated here. It was for the interest of both parties that the cotton should be put in order for sale, and under the arrangement made, if the claim of the petitioner was sustained here, he would have put his own cotton in order at his own cost. If the title was adjudged in the United States, they would have paid the petitioner for the service received from him. The arrangement made, therefore, was a consequence of the petitioner’s claim, and not evidence of its abandonment.
Nott, J., did not sit in this case, and took no part in the decision.